Phillip A. Silvestri, Esq. (Nevada Bar No. 11276)
Phillip.Silvestri@gmlaw.com
GREENSPOON MARDER LLP
3993 Howard Hughes Parkway Ste. 400
Las Vegas, Nevada 89169

Jeffrey A. Backman (*pro hac vice*)
Roy Taub (*pro hac vice)*
jeffrey.backman@gmlaw.com
roy.taub@gmlaw.com
**GREENSPOON MARDER LLP**
200 East Broward Blvd., Suite 1800
Fort Lauderdale, FL  33301
Tel:  (954) 491-1120
Fax: (954) 213-0140

*Attorneys for Defendant USHEALTH Advisors, LLC*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ERIN ROBERTSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PLAIN-ENGLISH MEDIA, LLC d/b/a PLAIN-ENGLISH HEALTH CARE d/b/a STRATEGIC HEALTH CARE MARKETING; and USHEALTH ADVISORS, LLC d/b/a USHEALTH GROUP,<br><br>Defendants. | CASE NO.: 3:24-cv-00429<br><br>**DEFENDANT USHEALTH ADVISORS, LLC'S MOTION TO COMPEL ARBITRATION**<br><br>**ORAL ARGUMENT REQUESTED** |

DEFENDANT'S MOTION TO COMPEL ARBITRATION

**PRELIMINARY STATEMENT**

Plaintiff is a serial Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. ("TCPA") litigant. Since June 2024, Plaintiff has filed ***nineteen*** class actions in various federal courts – including this one – each alleging a violation of the TCPA's prohibition on unsolicited telephone communications to telephone numbers registered on the national do-not-call list.[1] Plaintiff attempts to assert a single cause of action against USHA under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), alleging breach of the TCPA's prohibition on unsolicited telephone communications with numbers on the national do-not-call list. Plaintiff was texted, however, because on April 8, 2024 and May 31, 2024, she knowingly and voluntarily provided her telephone number and other personal information on the "AffordableHealthPlans.org" website (the "First Site"), and on April 24, 2024, she knowingly and voluntarily provided her telephone number and other personal information on "HealthPlanRate.com" (the "Second Site") and consented to receive telephone calls from, or regarding, among others, "USHealth Advisors." Each text message Plaintiff alleges that she received was dated on or after April 8, 2024. *See* Compl. at ¶¶ 38- 44.

When she did so, Plaintiff also expressly agreed to the Terms of Service on both Sites that require arbitration of the claims asserted in this lawsuit and to waive the right to bring a class proceeding. Under settled principles of law and in furtherance of the strong federal policy in favor of enforcement of arbitration agreements, this Court should compel Plaintiff to proceed to arbitration.

---

[1] *See Robertson v. Choice Fin. Mgmt.*, No. 3:24-cv-01086 (S.D. Cal.); *Robertson v. Accuquote*, No. 1:24-cv-05281 (N.D. Ill.); *Robertson v. Mortgage Rsch. Ctr.*, No. 2:24-cv-04106 (W.D. Mo.); *Robertson v. NextGen Leads*, No. 3:24-cv-01361 (S.D. Cal.); *Robertson v. CWPVA*, No. 8:24-cv-01722 (C.D. Cal.); *Robertson v. Clearone Advantage*, No. 1:24-cv-02312 (D. Md); *Robertson v. CoverageX*, No. 8:24-cv-01744 (C.D. Cal.); *Robertson v. Freerateupdate.com*, No. 8:24-cv-01760 (C.D. Cal.); *Robertson v. Wintrust Fin. Corp.*, No. 3:24-cv-00366 (D. Nev); *Robertson v. Network Cap. Funding*, No. 1:24-cv-23156 (S.D. Fla.); *Robertson v. Am. Home Shield*, No. 2:24-cv-01571 (D. Nev.); *Robertson v. BH Security*, No. 3:24-cv-02233 (N.D. Tex.); *Robertson v. Modernize, Inc.*, No. 1:24-cv-01077 (W.D. Tex.); *Robertson v. Plain-English Media, LLC*, No. 3:24-cv-00429 (D. Nev.); *Robertson v. Fidelity Life Ass'n*, No. 3:24-cv-00439 (D. Nev.); *Robertson v. Leosource Ins. Agency, LLC*, No. 0:24-cv-61826 (S.D. Fla.); *Robertson v. Offerpad Brokerage CA, Inc.*, No. 5:24-cv-02138 (C.D. Cal.).

- 1 -
DEFENDANT'S MOTION TO COMPEL ARBITRATION

### STATEMENT OF FACTS

On at least three separate occasions, Plaintiff visited and made submissions on two websites owned and operated by Excel Impact, LLC ("Excel Impact"), bearing the names "AffordableHealthPlans.org" and "HealthPlanRate.com."[2] Declaration of Dan Lilly ("Lilly Decl.") at ¶¶ 6,7, 19. Plaintiff's submissions on these two sites generated leads containing her name, telephone number, and other information, and Plaintiff received the alleged telephone solicitations based on those leads.

**A.    Plaintiff's visits to the First Site, AffordableHealthPlans.org**

Plaintiff made at least two submissions on the First Site, on April 8, 2024 at or around 12:53 p.m. Eastern Daylight Time and on May 31, 2024, at or around 8:37 a.m., Eastern Daylight Time. *Id*. at ¶ 7. The submissions were made at the URL https://affordablehealthplans.org/form. *Id*. The only way a submission could have been made on the First Site is as follows. Upon landing on the First Site, Plaintiff entered a zip code and clicked a "START MY QUOTE" button. *Id*. at ¶8. Plaintiff answered a series of questions such as: if she was looking for individual or family coverage, household size, household income, and gender. *Id*. After that, Plaintiff had the option to enter personal information such as date of birth, home address, full name, e-mail address and telephone number. *Id*. After entering that information, Plaintiff clicked the "Get My Free Quotes" button. Above that button is text that says "By clicking the 'Get My Free Quotes' Button, I agree to the consents below the button." The "consents" below the button read,

> By clicking 'Get My Free Quotes', I consent, via electronic signature: (i) to receive calls and texts about health insurance or other offers from Excel Impact, LLC and listed companies to the number(s) I provided via automated calling and prerecorded or artificial voice; consent is not required to purchase goods or services - opt out at any time by calling 833-637-0318; and (ii) to the Privacy Policy and Terms of

---

[2] Defendant is continuing to investigate the claims of Ms. Robertson, but does not wish to delay proceeding on this motion to compel arbitration. Whether Plaintiff agreed once, three times, or more does not change the fact that she agreed to arbitrate the claims asserted against Defendant.

DEFENDANT'S MOTION TO COMPEL ARBITRATION

Service (including mandatory arbitration). Message & data rates may apply. Text and call frequency varies.

*Id.*

A partial screenshot of the current layout of the online agreement described above, which is identical to the layout of the page on the First Site on April 8, 2024 and May 31, 2024 is produced below:

*Id.* at ¶ 9.  Clicking on the hyperlink for the "listed companies" on the website generates a pop-up box titled "List of Insurance Companies & Agencies That May Be Contacting You." *Id.* at ¶ 10. USHA is included on the listing and was on both April 8, 2024 and May 31, 2024. *Id.* at ¶ 10-11 & Exhibit A thereto.

The First Site also includes a hyperlink to its "Terms of Service" at the bottom of each page, in language stating, "By using this site, you acknowledge that you have read and agree to the Terms of Service, and Privacy Policy." Clicking on the hyperlink for the "Terms of Service" opens a new browser window contains the Terms of Service being agreed to. *Id.* at ¶ 12.  The arbitration

DEFENDANT'S MOTION TO COMPEL ARBITRATION

provision appears in the Section under the heading "8. Agreement to Arbitrate." *Id*. & Exhibit B thereto. The arbitration provision states, "You and we each agree that any and all disputes or claims that relate to or arise from your use of or access to our Services, or any products or services sold, offered, or purchased through our Services shall be resolved exclusively through final and binding arbitration, rather than in court, except that you may assert claims in small claims court, if your claims qualify. The Federal Arbitration Act governs the interpretation and enforcement of this Agreement to Arbitrate section (this 'Agreement to Arbitrate')." *Id*.

### B.    Plaintiff's Visit to the Second Site, HealthPlanRate.org

On April 24, 2024 at or around 3:35 p.m. Eastern Daylight Time, Plaintiff made a submission at the URL https://healthplanrate.com/form. *Id*. at ¶ 19.   The only way a submission could have been made on the Second Site is as follows.  Upon landing on the Second Site, Plaintiff entered a zip code and clicked a "GET A QUOTE" button. *Id*. at ¶ 20.  Plaintiff then answered questions such as: if she was looking for individual coverage or family coverage, household size, household income, and gender. After that, the Plaintiff had the option to enter personal information such as date of birth, home address, full name, e-mail address, and telephone number. *Id*. After entering personal information, Plaintiff clicked the "Get My Free Quotes" button. *Id*. Above the button is text that says "By clicking the 'Get My Free Quotes' Button, I agree to the consents below the button." The "consents" below the button read,

> By clicking 'Get My Free Quotes', I consent, via electronic signature: (i) to receive calls and texts about health insurance or other offers from Excel Impact, LLC and listed companies to the number(s) I provided via automated calling and prerecorded or artificial voice; consent is not required to purchase goods or services - opt out at any time by calling 833-637-0318; and (ii) to the Privacy Policy and Terms of Service. (including mandatory arbitration). Message & data rates may apply. Text and call frequency varies.

*Id*.

A screenshot of the current layout of the online agreement described above, which is identical to the layout of the page on the Second Site on April 24, 2024 is produced below:

- 4 -

DEFENDANT'S MOTION TO COMPEL ARBITRATION

*Id*. at 21. Clicking on the hyperlinked list of "listed companies" on the Second Site generates a pop-up box titled "List of Insurance Companies & Agencies That May Be Contacting You." *Id*. at ¶ 22. USHA is included in the listing and was included on April 24, 2024. *Id*. at ¶¶ 22, 23 & Exhibit C thereto.

The Second Site also includes a hyperlink to its "Terms of Service" at the bottom of each page, in language stating, "By using this site, you acknowledge that you have read and agree to the Terms of Service, and Privacy Policy." Clicking on the hyperlink for the "Terms of Service" opens a new browser window contains the Terms of Service being agreed to. *Id*. at ¶ 24 & Exhibit D thereto. The arbitration provision appears in the Section under the heading "8. Agreement to Arbitrate." *Id*.  The arbitration provision states, "You and we each agree that any and all disputes or claims that relate to or arise from your use of or access to our Services, or any products or services sold, offered, or purchased through our Services shall be resolved exclusively through final and binding arbitration, rather than in court, except that you may assert claims in small claims court, if your claims qualify. The Federal Arbitration Act governs the interpretation and enforcement of this Agreement to Arbitrate section (this 'Agreement to Arbitrate')." *Id*.

DEFENDANT'S MOTION TO COMPEL ARBITRATION

## ARGUMENT

### I.    APPLICABLE LEGAL STANDARDS

Section 4 of the Federal Arbitration Act ("FAA") permits a court to compel arbitration when one party, as in this case, has failed, neglected, or refused to comply with an arbitration agreement. 9 U.S.C. § 4. Arbitration agreements are governed by and enforceable under the FAA. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 23-24 (1991). Both federal and Nevada law favor arbitration. *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 719 (9th Cir. 1999) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."); *Uber Technologies, Inc. v. Royz,* 138 Nev. Adv. Op. 66, 517 P.3d 905, 908 (2022) ("Nevada has a 'fundamental policy favoring the enforceability of arbitration agreements,' and we will liberally construe arbitration clauses in favor of granting arbitration.'"). Consistent with that strong federal policy favoring arbitration, "[f]ederal law counsels that questions of arbitrability, when in doubt, should be resolved in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). (citing *Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Thus, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Cone Mem'l*, 460 U.S. at 24-25.

The Ninth Circuit has instructed that, under the FAA, a court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Id. See also*, *e.g.*, *Rodriguez v. Best Buy Co.*, No. 8:23-CV01194-DOC-KESx, 2023 WL 8946206, *2 (C.D. Cal. Nov. 14, 2023) ("The Act 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'") (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213,

218 (1985)).   Furthermore, "if the parties [formed] an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance." *Mahmud-Bey v. Luxottica of Am. Inc.*, No. 2:24-CV-04605-FWS-MAA, 2024 WL 4818800, *7 (C.D. Cal. Oct. 21, 2024) (quoting *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022)).

## II.    THE COURT SHOULD COMPEL ARBITRATION

### A.    A Valid Written Arbitration Agreement Exists

Plaintiff entered into at least one, if not multiple, valid agreement requiring her to arbitrate her TCPA claims against USHA when she agreed to the Terms of Service, including arbitration, on the First and Second Sites.   When determining whether a valid and enforceable contract to arbitrate has been established, federal courts apply "ordinary state-law principles that govern the formation of contracts to decide whether the parties agreed to arbitrate a certain matter." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995). "While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 403 (2d Cir. 2004)). "One such principle is the requirement that '[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.'" *Id.* (quoting *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 29 (2d Cir. 2002)). Under Nevada law, "[b]asic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson,* 119 P.3d 1254, 1257 (Nev. 2005).

Internet users can and often do form online contracts, and therefore assent, in a variety of ways. *See Colgate v. JUUL Labs, Inc.,* 402 F. Supp. 3d 728, 763 (N.D. Cal. 2019) (discussing different forms of online contracts). The Ninth Circuit recognizes three main types of contracts formed on the internet: "clickwrap [,]" "browsewrap[,]" and "sign-in wrap" agreements. *Id.* Online

agreements create valid contracts when a user has notice that taking an action will bind the user to terms and conditions and, on such notice, the user takes that action. *Nguyen,* 763 F.3d at 1177. In doing so, the notice must be conspicuous-that is, it must put a "reasonably prudent user on inquiry notice of the terms of the contract." *Id.* Moreover, it is well settled that a "[a] binding contract is created if a plaintiff is provided with an opportunity to review the terms of service in the form of a hyperlink" and it is "sufficient to require a user to affirmatively accept the terms, even if the terms are not presented on the same page as the acceptance button as long as the user has access to the terms of service." *Moretti v. Hertz Corp.*, 2014 WL 1410432, at *2 (N.D. Cal. Apr. 11, 2014) (citations omitted).

Both the First Site's and the Second Site's Terms of Use constitute an enforceable "modified clickwrap" agreement, *i.e.*, an online agreement that is accepted by clicking a button located near the relevant notice. *Darren MacDonald v. Rocket Mortg. LLC*, No. CV-23-02558-PHX-KML, 2024 WL 5200480, at *4 (D. Ariz. Dec. 23, 2024) (citing *Lee v. Panera Bread*, No. 1:22-CV-11958, 2023 WL 2606611, at *4 (E.D. Mich. Mar. 6, 2023)). In evaluating whether a user sufficiently assented to the terms of an online contract, the Ninth Circuit follows a two-part test. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). First, the website must provide "reasonably conspicuous notice of the terms to which the consumer will be bound." *Id.* And second, the consumer must "take[ ] some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* That leaves only the question of whether Plaintiff should have understood what she was agreeing to before submitting her phone number, that is, whether both Sites' communication consent was "reasonably conspicuous" such that "the court can fairly assume that a reasonable prudent Internet user would have seen it." *Id*. at 856.

As to the first factor, there can be no question that the layout of the First and Second Sites provided reasonably conspicuous notice of the respective Terms of Use. In evaluating whether a

- 8 -

website notice meets the "reasonably conspicuous" requirement, courts have considered (1) the size of the text; (2) the color of the text as compared to the background it appears against; (3) the location of the text (and specifically its position and proximity with respect to the button the user clicks to manifest assent); (4) the obviousness of hyperlinks to the terms of use appearing in the text; and (5) the layout of the rest of the screen, i.e., whether other elements clutter or draw attention away from the agreement. *See Cavanaugh v. Fanatics, LLC*, No. No. 1:22-CV-01085-JLT-SAB, 2024 WL 3202567, at *5 (E.D. Cal. June 26, 2024); *see also Berman*, 30 F.4th at 856 (examining whether the user's attention is drawn away from the critical text, the obviousness of any hyperlinks, the font size, and the contrast between the font color and its background).

The communication on both Sites' webpages provided "reasonably conspicuous" notice such that a reasonably prudent internet user would have seen it. On the submissions pages for both Sites, Plaintiff was informed, "By clicking the 'Get My Free Quotes' Button, I agree to the consents below the button," which placed Plaintiff on notice that clicking on the button would cause her to enter into some agreement.  Lilly Decl. at ¶¶ 8, 20.  Only a little below that, Plaintiff would have read on both sites, "By clicking 'Get My Free Quotes', I consent, via electronic signature: . . . to the Privacy Policy and Terms of Service (including mandatory arbitration)." *Id*. at ¶¶ 8, 9, 20, 21. Plaintiff thus was given reasonably conspicuous notice of not only that by clicking the button on the Sites she would be entering into an agreement, but furthermore that the agreement "includ[es] mandatory arbitration."  *Cf. HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 334 (W.D. Pa. 2020) ("[W]hile [the website] does not ask its users to check an "I Accept" box, as is the case with a typical clickwrap agreement, the placement of an explicit warning directly below a log-in button has a similar psychological effect. And clickwrap agreements are routinely enforced by the courts.").

Furthermore, on every page on both Sites, Plaintiff was advised, "By using this site, you acknowledge that you have read and agree to the Terms of Service, and Privacy Policy."  Lilly

DEFENDANT'S MOTION TO COMPEL ARBITRATION

Decl. at ¶ 12, 24. On the First Site, the words "Terms of Service" were stated in underlined text, as

show below in the partial screenshots:

Id. at ¶ 12.   And, on the Second Site, the words "Terms of Service" were stated in blue text, as

shown in the partial screenshot[3]:

Id. at ¶ 24.

The blue or underlined text "Terms of Service" on both Sites contrasted with the other text

to further make clear that the Terms of Service were hyperlinked (where Plaintiff could read the full

Arbitration Agreement), setting it apart.   Courts have found that such a reference to the terms or

_____

[3] Once the user begins the process of entering their information to receive the quote, the terms of service are no longer in blue text, but there is the same large text box at the bottom of each page (with hyperlinks).

DEFENDANT'S MOTION TO COMPEL ARBITRATION

conditions make their existence sufficiently conspicuous as to put the website visitor on inquiry notice of an agreement or contract.  *See*, *e.g.*, *Oberstein*, 60 F.4th at 516 (website provided reasonably conspicuous notice where hyperlink was "written in bright blue font, distinguishing it from the surrounding text"); *Dupler v. Orbitz, LLC*, 2018 WL 6038309, at *3 (C.D. Cal. July 5, 2018) (terms sufficiently conspicuous when placed in proximity to sign-up button and contained blue hyperlinks which contrasted with surrounding black text).

As to the second factor, Plaintiff provided her unambiguous manifestation of assent when she clicked the "GET MY FREE QUOTE" buttons.  Ninth Circuit courts have never required a checkbox for enforceability and frequently enforce online agreements without one. *See, e.g.,  Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (finding defendant provided reasonable notice where it "require[d] individual users to press a 'Play' button" but did "not require users to . . . confirm their assent prior to accessing the game"); *Crawford v. Beachbody, LLC*, 2014 WL 6606563, at *2-3 (S.D. Cal. Nov. 5, 2014) (upholding terms and conditions where the "Place Order" button was near the sentence, "By clicking Place Order below, you are agreeing that you have read and understand the Beachbody Purchase Terms and Conditions, and Team Beachbody Terms and Conditions"); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011) (compelling arbitration where user was required to click an "Accept" button placed above statement indicating that clicking on the button indicated assent to terms of services and providing hyperlink to those terms). Here, the substance of both the First and Second Sites clearly and explicitly explained the legal significance of the action button:

- 11 -

DEFENDANT'S MOTION TO COMPEL ARBITRATION

Moreover, "screen captures" using data tracked by an industry leader in lead validation, Jornaya, during Plaintiff's visits to the Sites provide visual evidence of her visits. *Id*. at ¶¶ 31-36. Plaintiff therefore cannot plausibly dispute that she visited the First Site on April 8, 2024 and May 31, 2024 and the Second Site on April 24, 2024, saw the layout and text as described above, and made submissions on the First and Second Site in part to receive phone calls, all of which effected

DEFENDANT'S MOTION TO COMPEL ARBITRATION

her agreement to the Terms of Service (including mandatory arbitration) and thus there is a valid agreement to arbitrate.

To the extent that there is a dispute as to the existence of a valid arbitration agreement, "when one party disputes 'the making of the arbitration agreement,' the [FAA] requires that 'the court proceed summarily to the trial thereof before compelling arbitration under the agreement.'" *Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007).[4]

**B.    The Remainder of the Analysis, Such as Whether Robertson's TCPA Claim Raises Arbitrable Issues, Has Been Delegated to the Arbitrator**

Before reaching gateway issues relating to the validity and scope of an arbitration agreement, as well as other questions of arbitrability, courts must determine whether the parties agreed to commit threshold questions of arbitrability to the arbitrator. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) (agreement to arbitrate "gateway issue" is "simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce"); *accord Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). If parties to an arbitration agreement have clearly and unmistakably agreed to delegate issues of arbitrability to the arbitrator, then the court cannot override that intention and the arbitrator must decide these threshold issues, "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586

---

[4] Where the issue is before a court, the FAA provides that "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. Since motions to compel arbitration are decided under "the summary judgment standard of Rule 56 of the Federal Rules of Civil Procedure," "once a district court concludes that there are genuine disputes of material fact as to whether the parties formed an arbitration agreement, the court must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues have been resolved." *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670, 672 (9th Cir. 2021). Under this procedure, "[t]he parties may not address other issues, including merits issues, before the court resolves these formation questions and [the] motion to compel." *Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 844 (6th Cir. 2021) (quoting 9 U.S.C. § 4).

DEFENDANT'S MOTION TO COMPEL ARBITRATION

U.S. 63, 67-68, 71 (2019).  *See also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

Here, the Arbitration Agreements (on both the First and Second Site) provide that the arbitrator – not a court – is to decide issues of arbitrability,  including a clause giving the arbitrator "exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement to Arbitrate, any part of it, or of this Agreement including, but not limited to, any claim that all or any part of the Agreement to Arbitrate or this Agreement is void or voidable." Lilly Decl., Ex. B at §8 & Ex. D at § 8.  And, the Arbitration Agreements further provide that "[t]he arbitration will be conducted by the American Arbitration Association ("AAA") under its rules and procedures, including the AAA's Supplementary Procedures for Consumer-Related Disputes (as applicable), as modified by this Agreement to Arbitrate."  *Id*.  Courts have recognized that under those rules, whether there is an agreement to arbitrate between the partes and whether the agreement covers the dispute "can be expressly delegated to the arbitrator."  *Brennan*, 796 F.3d at 1130. This incorporation-by-reference of arbitration rules that provide that the arbitrator, not the court, shall determine gateway issues of arbitrability constitutes clear and unmistakable evidence that parties agreed to arbitrate arbitrability. *See, e.g.*, *id.* (considering the rules of American Arbitration Association ("AAA")).  This Court should therefore compel Plaintiff to arbitrate the gateway question of arbitrability.

**C.      Even if Not Delegated, There Is No Question Plaintiff's Claims are Arbitrable**

Although ultimately a gateway issue for the arbitrator, to the extent the Court determines it must decide the issue, it is indisputable that the Terms of Use "encompasses the dispute at issue." *Chiron*, 207 F.3d at 1130. Absent ambiguity, "it is the language of the contract that defines the scope of disputes subject to arbitration." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002). In determining the scope of the arbitration clause, courts look at the parties' intent to submit the dispute to arbitration, starting at the language of the arbitration provision, and construing any doubt

- 14 -

in favor of arbitrability in accordance with the strong federal policy favoring arbitration. *See*, *e.g.*, *Mitsubishi*, 473 U.S. at 626 ("Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."). The Arbitration Agreement on both Sites states, in relevant part:

> You and we each agree that any and all disputes or claims that relate to or arise from your use of or access to our Services, or any products or services sold, offered, or purchased through our Services shall be resolved exclusively through final and binding arbitration, rather than in court, except that you may assert claims in small claims court, if your claims qualify. The Federal Arbitration Act governs the interpretation and enforcement of this Agreement to Arbitrate section (this "Agreement to Arbitrate").

Lilly Decl., Ex. B at § 8 & Ex. D at § 8. The same section also notes that it expressly includes "actions under the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq." *Id*.

Robertson's action brought here under the TCPA is one such action, and squarely arises from her use of or access to Excel Impact's "Services" on the Sites. *Id*. Both Sites' Terms of Service make clear, in Section 3, headed "Matching Tools and Services," that "[o]ur Website provides tools and services to help you find insurance coverage or quotes for insurance coverage, all of which are provided by third parties unaffiliated with [the Sites] (collectively, 'Insurers')," "with whom we may share your information . . . for the purpose of enabling you to find affordable insurance coverage," including through telephone calls to the telephone number submitted on the Site. *See id*., Ex. B at § 3 & Ex. D at § 3. Plaintiff's claims concern her opt-in and the consent that she submitted on the Sites to be called by USHA, one of the listed companies, which led to the calls at issue to Plaintiff. *Id*. at ¶¶ 7-30.

Moreover, the fact that Robertson's TCPA claim is a statutory claim does not place it outside the scope of a valid arbitration agreement. "It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA," "'unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'"

DEFENDANT'S MOTION TO COMPEL ARBITRATION

Gilmer, 500 U.S. at 26 (quoting *Mitsubishi*, 473 U.S. at 628). "[T]he party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000). Nothing in the text or legislative history of the TCPA evidences any such intention.

### D.    USHA has Standing to Enforce the Arbitration Agreement

USHA's standing to enforce the Arbitration Agreement has also been delegated to the arbitrator under controlling case law. *See Mohamed*, 848 F.3d at 1207-09 (enforcing delegation clauses that delegated issues of "enforceability, revocability or validity of the Arbitration Provision" to the arbitrator); *Wilson v. Hatch Bank*, No. 23CV813-JES (MPP), 2024 WL 1355492, *10 (S.D. Cal. Mar. 29, 2024).

Nonetheless, solely in the event the Court disagrees, USHA has standing to enforce the agreement as a third-party beneficiary. Although USHA is not a signatory to the Terms of Service or the Arbitration Agreement on either the First Site or Second Site, it is an intended third party beneficiary, and thus can enforce both Arbitration Agreements and compel arbitration of Plaintiff's claims. "[A]rbitration agreements may be enforced by nonsignatories through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'" *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1643-44 (U.S. 2020) (internal quotation omitted).

Nevada law allows an intended third-party beneficiary of an agreement to have standing to enforce the agreement. *See Morelli v. Morelli*, 720 P.2d 704 (Nev. 1986). "Whether an individual is an intended third-party beneficiary . . . depends on the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered." *Canfora v. Coast Hotels & Casinos, Inc.*, 121 P.3d 599, 605 (Nev. 2005) (internal quotation omitted). That intent is indisputable here, and USHA can enforce the Arbitration Agreements based on its third-party beneficiary status.

The Terms of Service both establish that "Our Website provides tools and services to help you find insurance coverage or quotes for insurance coverage, all of which are provided by third parties unaffiliated with [the Sites] (collectively, 'Insurers'),'" and the term "Insurers" is further defined to include, among other things  "[the Sites'] marketing partners, and affiliates or finders working on behalf of insurance companies, with whom we may share your information (as described in our Privacy Policy) for the purpose of enabling you to find affordable insurance coverage." Lilly Decl., Ex. B at § 3 & Ex. D at § 3. Both Terms of Service further state, under the heading "8. Agreement to Arbitrate":

> You and we each agree that ***any and all disputes or claims that relate to or arise from your use of or access to our Services, or any products or services sold, offered, or purchased through our Services*** shall be resolved exclusively through final and binding arbitration, rather than in court, except that you may assert claims in small claims court, if your claims qualify.

*Id*. at Ex. B at § 8 & Ex. D at § 8. (emphasis added).

Notably, the arbitration agreement is not limited to claims brought against the parties to the Arbitration Agreement. This showing is more than enough to find Plaintiff's claims raise an arbitrable dispute that she agreed "shall be solved exclusively through final and binding arbitration," including when asserted against someone other than Excel Impact, as the TCPA claims in this case "relate to or arise from [Plaintiff's] use of or access to the "Services, or any products or services sold, offered, or purchased through [Excel Impact's] Services," (*id.*), and the calls arose only from the opt-in on the Website.  *See, e.g., Mohammad v. T-Mobile USA, Inc.*, No. 2:18-CV-00405-KJM-DB, 2018 WL 6249910, at *8 (E.D. Cal. Nov. 29, 2018) (explaining "the plain meaning of the arbitration agreement in T-Mobile's Terms & Conditions evidences the parties' intent to include claims against third-party vendors within the scope of the arbitration agreement" where the "arbitration provision 'includes any claims against other parties relating to Services or

DEFENDANT'S MOTION TO COMPEL ARBITRATION

Devices provided or billed to you (such as our suppliers, Dealers or third party vendors) whenever you also assert claims against [T-Mobile] in the same proceeding"'").

### D.    USHA has not waived the right to arbitrate

Finally, USHA has not waived the right to arbitrate Plaintiff's claims.    For over three decades, the Ninth Circuit has uniformly held that the "[w]aiver of a contractual right to arbitration is not favored." *Fisher v. A.G. Becker Paribas Inc*., 791 F.2d 691, 694 (9th Cir. 1986). "Any examination of whether the right to compel arbitration has been waived must be conducted in light of the strong federal policy favoring enforcement of arbitration agreements." *Id*. (citing *Moses H. Cone Hosp. v. Mercury Construction Corp., 460 U.S. 1, 24-25 (1983).   "[A] party acts inconsistently with exercising the right to arbitrate when it (1) makes an intentional decision not to move to compel arbitration and (2) actively litigates the merits of a case for a prolonged period of time in order to take advantage of being in court." *Newirth by & through Newirth v. Aegis Senior Communities, LLC*, 931 F.3d 935, 941 (9th Cir. 2019).   USHA is moving to compel arbitration shortly after filing its answer to Plaintiff's Amended Complaint, after asserting an enforceable arbitration agreement as an affirmative defense, (Dkt. No. 20), and before engaging in discovery. There has been no waiver.

### CONCLUSION

This case must be compelled to arbitration and the proceedings stayed under Section 3 of the FAA until the arbitrator enters a final award, or alternatively, to a Section 4 trial if the Court believes it cannot resolve the question of whether an arbitration agreement was made.

DATED:  February 5, 2024                    GREENSPOON MARDER LLP

By: */s/ Roy Taub*
Jeffrey A. Backman (pro hac vice)
Roy Taub (pro hac vice)
jeffrey.backman@gmlaw.com
roy.taub@gmlaw.com
GREENSPOON MARDER LLP
200 East Broward Blvd., Suite 1800

DEFENDANT'S MOTION TO COMPEL ARBITRATION

Fort Lauderdale, FL  33301
Tel:  (954) 491-1120
Fax: (954) 213-0140

Phillip Silvestri, Esq. (SBN 11276)
Phillip.Silvestri@gmlaw.com
3993 Howard Hughes Parkway, Suite 400
Las Vegas, NV 89169
Tel:  (702) 978-4249
Fax:  (702) 629-5891

*Counsel for Defendant*
*USHEALTH Advisors, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 5, 2024, a true and correct copy of the foregoing was electronically filed with the Clerk of Court by using CM/ECF which will serve copies to all counsel of record registered to receive CM/ECF notification, and that it was served upon any other counsel and parties in some other authorized manner.

/s/ Roy Taub
Roy Taub, Esq.

- 19 -
DEFENDANT'S MOTION TO COMPEL ARBITRATION